UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 15-2362-JSO

UNITED STATES OF AMERICA

vs.

JESUS TELLO, REINALDO MARTIN CRUZ,
MICHAEL PEREZ, RONALD ALFARO,
ARISTIDES PAULINO, AND KERI DIXON

    Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____
ANTHONY W. LACOSTA
ASSISTANT UNITED STATES ATTORNEY
Court No. A5500698
99 N. E. 4th Street
Miami, Florida 33132
TEL (305) 961- 9280
FAX (305) 536-4676
anthony.lacosta@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Jesus Tello, Reinaldo Martin Cruz, Michael Perez,<br>Ronald Alfaro, Aristides Paulino, and Keri Dixon,<br>*Defendant(s)* | ) ) ) Case No. 15-2362-JJO<br>) )<br>) ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __Jan. 2011 through Dec. 2014__ in the county of __Miami Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiry to commit wire fraud (deprivation of honest services) in violation of 18 U.S.C. § 1343 and 1346; and<br>Conspiracy to give bribes to a public official, or accept bribes as a public official, in connection with a state or local government agency receiving federal funds, in violation of 18 U.S.C. §§ 666(a)(1)(B) and (a)(2); |

As more fully described in the Attached Affidavit

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT OF FBI SPECIAL AGENT DONALD MORIN II

☑ Continued on the attached sheet.

*SA Donald P. Morin, II*
*Complainant's signature*

FBI Special Agent Donald Morin, II
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __03/19/2015__

*Judge's signature*

City and state: __Miami, Florida__    John O'Sullivan, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Donald P. Morin, II being duly sworn, depose, and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since 1999. I am currently assigned to the Miami Division of the FBI where my investigative responsibilities include public corruption and civil rights matters. In my work with the FBI, I have conducted numerous investigations concerning violations of federal laws by public officials.

2. The information contained in this affidavit is based on my personal knowledge from my work on this investigation and information provided to me by other law enforcement officers. The information in this affidavit is provided for the limited purpose of establishing probable cause of the arrest of **Keri Dixon, Aristides Paulino, Jesus Tello, Reinaldo Martin Cruz, Ronald Alfaro, and Michael Perez.** Because this affidavit is provided for this limited purpose, this affidavit does not contain every fact that is known to me and other investigators regarding the defendants and this ongoing investigation.

### General Allegations

3. Both Aristides **Paulino** and Keri **Dixon** have been employed as a City of Miami Police Department (MPD) Public Service Aide (PSA) since 2008. A PSA is a uniformed MPD employee whose work involves nearly all duties as performed by police officers. The chief difference between a PSA and an officer is enforcement powers, that is, a PSA cannot make an arrest. A PSA does have access to law enforcement databases and is used for a variety of non-hazardous law enforcement functions. For example, City of Miami PSAs will respond to and process motor vehicle accidents, write accident reports, issue accident summons, and perform other duties as required.

4. The City of Miami Police Department is a local government agency that receives more than $10,000 of federal funding in any given year. Your affiant has reviewed records from the City of Miami that showed United States Department of Justice funding for the COPS Hiring Program for the MPD. In any given year, the City of Miami has received well over $10,000 in federal funds. For example, MPD records reflect the following invoice dates and approximate payment amounts:

   a. December 30, 2011 - $175,403.25
   b. September 30, 2012 - $215,028.17;
   c. January 28, 2013 - $176,621.65
   d. September 30, 2013 - $942,956.71;
   e. April 11, 2014 - $168,071.90;
   f. January 26, 2015 - $280,494.96.

5. MetroPCS is a cellular telephone service provider. When a MetroPCS cellular

1

telephone sends or receives a text message, that message is routed through company servers that are physically located in Texas. Accordingly, any text message that is sent by, or received by a MetroPCS cellular telephone located in Florida must cross state lines.

## Pirate Towing

6. When a traffic accident occurs in the City of Miami, inoperable vehicles are moved from the scene of that accident by privately owned tow truck companies. The City of Miami has established a wrecker operator system for the purpose of protecting drivers and preventing corruption. When a car is disabled because of an accident, the driver must call a tow company himself, have his insurance company arrange a tow, or ask the responding officer or PSA to arrange a tow. If an officer or PSA is asked to arrange the tow, almost every police department, including the MPD, has strict regulations on how that tow referral must be made. Florida State law (Fla. Stat. § 323.002) prohibits an unauthorized tow truck operator from soliciting business from the driver of a disabled vehicle before the authorized tow truck has arrived at that accident scene.

7. The MPD has an authorized tow truck vendor list. When an accident or other traffic incident occurs that results in a disabled vehicle, the responding officer must call dispatch to arrange for a tow truck (unless the driver makes his own arrangements). Dispatch will then select the authorized tow truck from the rotation list for the area where the disabled vehicle is located. In order to be an approved vendor on the tow truck rotation list, a tow truck company must enter a contract with the City of Miami. In that contract (a/k/a "wrecker agreement"), the rotational wrecker company agrees to certain conditions, which include paying the City a certain amount of money (approximately $25) for each rotational tow.[1] Because there are a large number of accidents in the City of Miami on a daily basis, a position on the authorized tow truck list is lucrative. Other circumstances such as the type of vehicle, storage costs, or other incidentals can also make a tow even more profitable. Tow trucks that circumvent this list or other regulations regarding picking up disabled cars are referred to within the industry as "pirates."

8. Auto-collision shops also participate in pirate towing. The incentive of auto-collision repair shops is that if tow trucks bring damaged vehicles to the repair shop's location, the repair shop can get the business for repairing the damaged vehicle. Thus, the auto-collision shops will send pirate tow truck operators to accidents in an effort to secure the tow and thereby

---

[1] The wrecker agreement also prohibits the rotational wrecker company's drivers from stopping at accident scenes and soliciting the public. The wrecker agreement also prohibits tow truck company drivers from soliciting or inducing drivers or owners of towed vehicles from patronizing particular garages or mechanics. The tow truck company and its employees are also prohibited from accepting kickbacks from a garage or mechanic. The tow truck company and its employees are also prohibited from paying gratuities to any City employee.

2

get the auto-repair business. The City of Miami contract prohibits authorized rotational wreckers from soliciting or inducing the drivers of disabled vehicles from patronizing particular garages, body shops or mechanics. The same contract prohibits rotational wreckers from accepting kickbacks for directing business to particular auto-collision shops.

### The General Scheme

9.  In 2013, your affiant and other investigators received information from a confidential human source (CHS) that tow truck drivers and auto collision companies (a/k/a "garages") were paying police officers and public service aides money to illicitly steer business in their direction.

10. Based on discussions with persons in the tow industry, confidential sources, other law enforcement personnel, and the resulting investigation (as described in part below), your affiant and other investigators have learned that corrupt police officers and PSAs can earn money by misusing their official position. The scheme can work in different ways, but two common variations are as follows:

> a. First, if there is a corrupt officer or PSA at the scene, that corrupt official can permit, or even assist, the responding pirate tow truck's illegal solicitation of the stranded driver. The pirate tow truck operators can often identify locations where corrupt officials are present through monitoring police frequencies through police scanners. The corrupt officials will also often notify the pirate tow truck operators themselves, calling or texting with the accident location.

> b. Secondly, through review of the police computer, a corrupt officer or PSA can also track accidents in real time as they are reported and then promptly send that non-public information directly to a pirate tow truck operator. That tow truck operator can then respond to the scene and illegally solicit business from the stranded driver before any police personnel arrive at the scene and interfere or take law enforcement action against the tow truck operator.

11. In order to conceal the scheme, the corrupt PSAs and officers often falsify police reports, indicating that the vehicle was towed at the owners request when in truth the tow resulted from an improper solicitation. Alternatively, the information regarding the disposition of the vehicle can be left blank, or the corrupt official indicates that the driver drove the vehicle from the accident scene when in truth the vehicle was towed by a pirate wrecker. In instances where the tow truck driver has arrived and successfully solicited business from the accident

3

victim before a non-corrupt officer has arrived, that unwitting officer will incorrectly classify the tow as "owners request."

12. Once the pirate tow truck operator acquires the tow, the operator tows the vehicle to a garage that is participating in the scheme. Once the garage gets the business, the driver receives a kickback based upon the anticipated value of the accident, that is, the anticipated profits. The kickback is then shared both with the owner of the pirate tow truck operator's vehicle and the corrupt PSA or officer.

13. After being notified of the problem in 2013, your affiant and other investigators began investigating these allegations. The following facts describe some of the evidence developed regarding a pirate tow group that corruptly paid money to City of Miami PSA Aristides Paulino and PSA Keri Dixon.

### Jesus Tello's Interview

14. On February 26, 2014, a tow truck driver named Jesus Tello agreed to participate in an interview with your affiant and two other investigators. During the interview, Tello admitted that he worked for two authorized wrecking companies (Wrecker Company #1 and Wrecker Company #2), but that he was paying public service aides directly to circumvent the rotational wrecker process.

   a. In regard to PSA Paulino, Tello admitted paying PSA Paulino at least $20,000 to $25,000 in bribes over the tow-year period preceding the interview. Tello also admitted providing PSA Paulino favors during the same period (such as arranging for the repair of a car) that were valued in excess of $7,000 or $8,000.

   b. In regard to PSA Dixon, Tello admitted paying Dixon between $2,000 and $3,000 a week, for approximately a year.

15. Tello admitted that he paid the public officials, including PSA Dixon and PSA Paulino, to induce them to misuse their official positions. For example, both PSA Dixon and PSA Paulino allowed Tello to illegally solicit business directly from stranded motorists at the PSAs' assigned accident scenes, outside the rotational tow system. Second, the officials would also use their access to non-public accident information to inform Tello of accident locations that had not been assigned on the radio to a responding unit. (With this information, Tello could approach the stranded drivers directly and illegally solicit business at the scene before any responding units arrived at the scene.) Tello indicated that he would communicate with both PSA Dixon and PSA Paulino by cellular telephone, including by text messaging. Tello provided consent for investigators to photograph text messages between Tello and each PSA (Dixon and

4

Paulino), which corroborated his statements.[2]

### PSA Keri Dixon's Interview

16. On April 16, 2014, FBI Agents interviewed PSA Dixon. During that interview, PSA Dixon admitted to receiving approximately $6,000 in bribes. Dixon stated Tello provided her this money in return for providing Tello with accident locations and allowing Tello to solicit business from the drivers of crashed vehicles. Upon receiving the accident information, Tello would then improperly steer the resulting business to a specific auto collision repair shop, such as "Garage #1,"[3] by towing the vehicle there. During the course of working with Tello, Tello explained to PSA Dixon that "Subject #1"[4] of "Garage #1" provided him with Dixon's payments. On occasion, PSA Dixon admitted meeting Subject #1 directly. Dixon stated that on one occasion Subject #1 gave Dixon an envelope that contained $500 for a trip PSA Dixon took to Jamaica. Additionally, for Christmas, Subject #1 gave Dixon a card with $100 in it as well as brand name shoes. On another occasion Subject #1 gave Dixon a Michael Kors burgundy handbag. Additionally, PSA Dixon stated that Tello introduced PSA Dixon to other pirate tow truck operators who, in total, paid PSA Dixon, thousands of dollars for the same services that PSA Dixon provided to Tello. These drivers were Michael Perez ("Mikey"), Reinaldo Martin Cruz ("Buty"), and Ronald Alfaro ("Ronald").

17. PSA Dixon further reported that Tello subsequently warned her that he had been approached by the FBI in February 2014. Tello warned PSA Dixon to stop sending him text messages, and that he had retained the services of an attorney. Tello instructed PSA Dixon not to say anything should the FBI contact her and to deny everything regarding the scheme.

### PSA Aristides Paulino's Interview

18. On December 1, 2014, PSA Paulino was interviewed by investigators. On that date, Paulino admitted that he had accepted money from Jesus Tello for a number of years. In return for the money, Paulino would use his position as a PSA to provide Tello non-public information regarding the location of traffic accidents and information about the accidents (including the insurance company). If Paulino was working the scene, he would also allow Tello to circumvent the rotational wrecker system and improperly solicit business from the stranded drivers directly at the scene. During the interview, Paulino estimated that he conducted business with Tello from in or around 2011, through 2014, when Paulino was warned by Tello that the

---

[2] For example, one thread of messages between PSA Paulino and Tello occurred on or about September 25, 2013, through on or about January 16, 2014. Many of the text messages relate to the location of accident scenes (street addresses) and also describe the type of vehicles involved in those accidents.

[3] Garage #1 is a known incorporated auto collision repair company, which is physically located within the Southern District of Florida. The company does business with numerous auto-insurance companies, many of whom are headquartered outside the State of Florida.

[4] Subject Number #1 is a known person and the registered owner of Garage #1. Interviews with company employees have confirmed that Subject #1 is the primary bookkeeper for Garage #1 and an active manager.

FBI had contacted him about the scheme. While Paulino stopped referring accidents directly to Tello after this warning, Paulino admitted that he did improperly run a tag for Tello within the last six months to provide Tello the registrant's insurance policy.

19. In addition to Tello, PSA Paulino admitted receiving bribes from three other tow truck drivers, all of whom were introduced through Tello. These drivers were Michael Perez ("Mikey"), Reinaldo Martin Cruz ("Buty"), and Ronald Alfaro ("Ronald"). In each instance, Paulino stated he received the money from these individuals in return for providing accident information, or otherwise using his position as a PSA, to assist these drivers in performing improper tows. In regard to Perez, Paulino admitted that he provided his MPD-issued computer to Perez so that Perez and another known person could use the computer to access the MPD system and locate accidents that were holding.[5]

20. Paulino admitted that he knew that the towed vehicles were being taken to Garage #1. Shortly after he started working with Tello, Paulino reported Tello took Paulino to Garage #1, where Tello introduced Paulino to Subject #2,[6] the owner of Garage #1. Tello introduced Subject #2 and explained to Paulino, in Subject 2's presence, that the money Paulino was being paid was coming from Subject #2. Subject #1 was also present during that meeting, but out of earshot, in a nearby car.

### Ronald Alfaro's Interview

21. On December 2, 2014, Ronald Alfaro was interviewed by investigators. Alfaro stated that some time around 2011 or 2012, he met Jesus Tello, while working at Wrecker Company #1.[7] Alfaro learned from Tello that he could make money by participating in a pirate scheme, involving PSA Dixon and PSA Paulino. Tello explained that PSA Dixon would be paid $50 to $100 per accident and that the resulting pirate tows would be taken to Garage #1. At Garage #1, the damage to the vehicle would be evaluated and 15% of the estimated vehicle damage would be paid to Alfaro (average $100 to $900 a vehicle).

22. Alfaro admitted participating in the scheme. Alfaro stated that he was paid cash by Garage #1's owner (Subject #2), and Alfaro would, in turn, pay each PSA, using a portion of that money. Alfaro also stated that Wrecker Company #1 would receive a kickback for each tow delivered to Garage #1. Alfaro admitted receiving accident locations *via* text message from PSA

---

[5] An accident that is "holding" is an accident that has been reported to a police department but has not yet been assigned to an officer or PSA. This information is especially valuable to pirate tow truck operators because this information has not yet been released over the radio. Thus, a pirate with access to this information can not only arrive at the scene before the responding police official and illegally solicit business without interference, but also the driver with this information can beat out other pirate wreckers who are improperly listening for calls on the police frequency.

[6] Subject #2 is a known person, who married to Subject #1. While Garage #1 is in the Subject #1's name on the corporate records, many people that have been interviewed state that Subject #2 is an owner of Garage #1.

[7] Wrecker company #1 is an incorporated tow truck company that is physically located in the Southern District of Florida.

6

Paulino. Alfaro also admitted illegally soliciting business from stranded drivers in both PSA Paulino's and PSA Dixon's presence.

### Michael Perez's Interview

23. On December 2, 2014, a Wrecker Company #1 tow truck driver named Michael Perez was interviewed by investigators. Perez admitted participating in a scheme with Tello and other persons to bribe two public service aides in return for accident information. Perez identified the two public safety aides as PSA Dixon and PSA Paulino.

24. Perez stated that he was introduced to the scheme by Tello. Tello explained that PSA Dixon and PSA Paulino would provide them accident information, which would permit the drivers to directly solicit the accident victims outside the rotational wrecker program. The tow truck drivers would then tow the cars to specific body shops, including Garage #1. The drivers would receive a commission based upon the value of the accident. The commission was paid in cash. The commission was often between $300 to $1,500 per car. Perez also admitted he was required to split half the commission with Wrecker Company #1 and also that the PSA would get $100. Perez identified the three other drivers that participated in the scheme as Tello, Martin Cruz, and Alfaro.

25. During the interview, Perez was shown a series of text messages between himself, PSA Paulino, Alfaro, and another known person. Perez admitted that these text messages were related to use of PSA Paulino's MPD-issued computer. Perez admitted that PSA Paulino had provided him the MPD computer and PSA Paulino's password so that Perez and the others could use the computer to locate accidents. Perez admitted that he paid PSA Paulino $150 for successfully soliciting from several accidents scenes by using the police computer. Perez stated that he only used the police computer for 3 or 4 weeks, before returning the computer to PSA Paulino.

### Retrieval of Documentary Evidence

26. Through use of search warrants, investigators have recovered stored text messages from MetroPCS, the service provider for cellular telephone numbers each used by PSA Dixon and PSA Paulino. Investigators have separately obtained collision repair files, including associated tow slips, from Garage #1.

27. The following accidents, which aggregate to well over $5,000 in value, are provided as particular examples of the scheme.

7

## Jesus Tello Examples

**January 10, 2013**

28. A Florida Traffic Crash Report completed by PSA Keri Dixon documents a crash occurring on January 10, 2013, near the intersection of S. Miami Avenue and S.W. 7th Street. One of the vehicles involved in the crash was a 2006 Lexus. PSA Dixon's report stated that the vehicle was towed and in the box marked rotation stated "Driver."

29. The Lexus driver was subsequently interviewed by investigators. The driver indicated that he had no idea how a wrecker arrived at the scene and was certain that he did not call the wrecker. The Lexus driver vaguely recalled the tow truck operator interacting with the officer at the scene, but couldn't remember any details regarding the officer's appearance. The Lexus driver stated the tow truck operator suggested taking the Lexus to the collision repair center, promising the collision repair center would take care of the driver. At the time, the Lexus driver didn't think anything of it, stating that once you are in an accident, all you think out about is getting towed.

30. Review of Garage #1 repair file #2305 indicates the Lexus in question was towed to Garage #1 by Jesus Tello using a Wrecker Company #1 truck. The Wrecker Company #1 tow slip indicates the $26.00 city administrative fee was charged for the tow. However, City of Miami Police Department CAD records do not record a Wrecker Company #1 truck being dispatched through rotation on that date. Further, 1 Wrecker Company #1 never paid the requisite $25.00 fee that is contractually required and falsely indicated on the tow slip. GEICO insurance paid Garage #1 more than $6,000 for the repairs to the Lexus.

**January 14, 2013**

31. Garage #1 repair file #2308 documents the intake of a damaged 2008 BMW 328i on January 14, 2013. The Wrecker Company #1 tow slip (#51863) in the repair file documents that the tow truck driver who delivered the vehicle was "Tello." Per the file, Garage #1 was ultimately paid approximately $5,876 by the insurance company.

32. Review of MPD records indicates that MPD PSA Aristides Paulino handled the accident, which occurred at approximately S.W. 37th Avenue and El Prado Blvd. The Florida Traffic Crash report indicates that the damaged BMV was removed from the scene by a "private tow" at the "Owner Request."

33. Investigators have interviewed both the woman driving the vehicle and the owner of the vehicle (her husband). During those interviews, the wife indicated that she was in an accident. Both the wife and the husband (the vehicle's owner) state that the husband arrived at the accident scene shortly after the accident. Neither the husband, nor the wife, requested the tow truck company respond to the accident. Similarly, neither the husband, nor the wife, requested that the damaged BMW be towed to Garage #1.

8

**January 30, 2013.**

34.     A Driver Exchange of Information Form completed by PSA Keri Dixon documents her processing of an accident scene occurring near Bird Avenue and Dixie Highway on January 30, 2013. One of the vehicles involved in that accident was a Ford Edge.

35.     The driver of the Ford Edge was subsequently interviewed by investigators. When the driver was asked how he was towed from the scene, the driver indicated that it was "strange." The driver stated he called 911, but that the responding PSA took a very long time to arrive. Before the PSA arrived at the scene, however, a tow truck operator arrived and explained that he had been dispatched by the police. The tow truck operator let the stranded driver know that he worked with the stranded driver's insurance provider, and that he would take the disabled Ford to the shop. When the PSA arrived later, the PSA did not ask any questions about why the tow truck was there. The driver's general description of the PSA was consistent with PSA Dixon's appearance. When the driver was towed to Garage #1, the people at the shop contacted his insurance, did the paperwork with him, and arranged his rental car. In regard to the whole process, the driver stated: "I felt overrun."

36.     Garage #1 repair file #2374 confirms that the Ford was towed to Garage #1 by Tello, who was using a Wrecker Company #1 truck. The tow invoice indicates the $26.00 rotation fee was paid to the City. Review of MPD records indicates, however, that a rotational wrecker was not notified through dispatch and Wrecker Company #1 never paid the requisite $26.00 fee for a rotational tow. The value of the repairs paid on the Ford were in excess of $11,000.

**January 8, 2014**

37.     On January 8, 2014, PSA Dixon sent Tello a text message containing an accident location: "32av 8st." Subsequent review of MPD and Garage #1 records confirmed that Jesus Tello, driving a tow truck for Wrecker Company #2,[8] towed a disabled vehicle from this location. The MPD accident report, which was written from a PSA different than Dixon, showed that the accident occurred at SW 32 Avenue and SW 8th Street. The accident involved a Buick, Florida tag XXXWGF, which the accident report indicated had been removed from the accident scene by Wrecker Company #2's at "owners request." The PSA handling the scene had initially contacted a rotational wrecker response through dispatch, but subsequently cancelled the request.

38.     The Buick's driver was subsequently interviewed by investigators. The driver stated that she was involved in a traffic accident on January 8, 2014, at S.W. 32nd Avenue & 8th Street. The driver recalled two City of Miami PSAs on the accident scene. The driver recalled that one of the two PSAs told her that a tow truck would respond to the scene and help her out.

---

[8] Wrecker Company #2 is a tow truck company that is physically located and does business in the Southern District of Florida.

9

The driver's description of one of the PSAs matched Dixon's description. The driver did not contact the tow truck herself.

39. A recovered text message from PSA Dixon to Tello confirms PSA Dixon's role in the improper transfer of business from a rotational tow to a pirated tow: "See I'm here convincing the lady for you telling her you're a good guy." The text communication indicated that Dixon was at the accident location and assisted Tello before he arrived on scene to solicit business from the driver.

40. Garage #1 repair file #3599 shows Tello towed the Buick to Garage #1. The repair file contained a tow bill from Wrecker Company #2 for the 2003 Buick. The tow bill had the handwritten note "Tello Alone" in the margin. The repair file contained a copy of a check from COPART in the amount of $1619.00 which was the amount indicated on Garaage #1's Authorization for Release of Vehicle form for storage (14 days at $80 a day) yard fee ($100), administrative fee ($150), tow bill ($154) and taxes.

**January 27, 2014**

41. On January 27, 2014, MPD records indicate PSA Dixon was at an accident scene located at S.W. 27 Avenue and 27 Street. PSA Dixon generated an MPD accident report. One of the vehicles involved in that accident was a 2011 Toyota van. The Wrecker Company #1 tow receipt in Garage #1's repair file #3682 indicates that the vehicle was towed to Garage #1 by the tow truck driver "Tello." The repair file also contains a copy of a Driver's Exchange form. This form identifies PSA Dixon as the PSA who took the report at the accident. Additionally, the repair file contained a copy of a check from United Automobile Insurance Company in the amount of $2,865.45.

42. The driver of the Toyota van was subsequently interviewed by investigators. The driver stated that she did not call for the tow truck driver who arrived first on scene. The driver stated the tow truck driver solicited her business at the accident scene. The tow truck operator also recommended the driver have Garage #1 repair her car.

43. The following text messages were exchanged between PSA Dixon and Tello after the January 27th accident involving the Toyota van:

Dixon: "Where were u"

Tello: [the initials of Garage #1]

Dixon: "Oh so u getting paid today huh"

      Tello: "After 2"

      Dixon: "Wats after 2"

      Tello: "Paid"

      Dixon: "Make sure u bring my money"

This text message exchange is consistent with PSA Dixon's admission that she was being paid by Tello and [Garage #1] to illegally solicit business at her accident scenes.

### Reinaldo Martin Cruz

**January 11, 2014.**

      44.    On January 11, 2014, Dixon sent Martin Cruz a text message listing the location and vehicle description of two accident vehicles: "22 22, Silver Nissan black Hyundai."[9] Review of an MPD accident report confirms that an accident occurred during this timeframe at 22nd Avenue and Coral Way (SW 22 Street). Consistent with the message, one of the vehicles involved in the accident was a black Hyundai Sonata, Florida tag number XXXQ18. The accident report, which was written by another police officer (not Dixon), showed that the vehicle was removed by Wrecker Company #1 at the owner's request.[10]

      45.    Repair file #3622 from Garage #1 showed that the black Hyundai Sonata was towed to Garage #1 on January 11, 2014. The repair file contains a tow bill from Wrecker Company #1 for the black Hyundai.[11] The tow bill identifies the Wrecker Company #1 driver as "Buty," which your affiant knows is a nickname for Martin Cruz. The repair file contained three checks from State Farm Mutual Automobile Insurance Company (State Farm) for the vehicle's repair in the following amounts: $2,645.19, $625.47, and $134.00. State Farm's headquarters is located in Bloomington, Illinois.

      46.    The driver of the black Hyundai was subsequently interviewed by investigators. The driver stated that she did not call for the tow truck driver who arrived first on scene. Instead, the tow truck driver solicited her business and recommended Garage #1 before the officer arrived at the scene.

---

[9] Your affiant has confirmed the telephone number ending in 3768 belongs to Reinaldo Martin Cruz through an interview with Dixon who stated she communicated with him during the scheme using that telephone number.

[10] By unlawfully soliciting business from the driver at the accident, Martin Cruz caused the officer to falsely state on the report that the vehicle was towed by owner's request, when in truth, the tow was the result of an unlawful solicitation.

[11] While the complete entry on the Wrecker Company #1 tow bill under vehicle make was listed as "Nissan Hyundai," the listed accident location and license plate match the Hyundai.

**February 4, 2014.**

47.    On February 4, 2014, Dixon sent Martin Cruz a text message listing the location of an accident: "Bird Dixie." During this timeframe, a MPD accident report showed an accident occurred at Bird Avenue and South Dixie Highway involving a Toyota Prius, Florida tag number XXXFLE. The accident report showed that the vehicle was removed by Wrecker Company #1 at the owner's request.

48.    Repair file #3719 from Garage #1 showed that a Toyota Prius, Florida tag number XXXFLE, was towed to Garage #1 on February 4, 2014. The Garage #1 repair file contained a tow bill from Wrecker Companyt #1 for a Toyota Prius. The Wrecker Company #1 tow bill lists the vehicle identification number (VIN) instead of the Prius's tag number with the name "Buty" (Cruz Martin) as the tow truck's driver. The VIN number on the Wrecker Company #1 tow bill matched the VIN on the MPD accident report. The Garage #1 repair file contained one check from Farmer's Insurance in the following amount: $4,153.22. Farmer's Insurance's headquarters is located in Los Angeles, California.

49.    The driver of the Prius was subsequently interviewed by investigators. Per the results of interview, the driver did not request the tow truck operator. Instead, the tow truck operator arrived on scene before the responding officer, solicited business from the driver, and recommended Garage #1. The tow operator told the driver that she would not have to pay her deductible by having her car repaired at Garage #1. The interviewing investigator reviewed the estimate in the Garage #1 file which showed that the driver was not required to pay the $750 deductible.

**February 7, 2014**

50.    On February 7, 2014, Dixon sent Martin Cruz by text message the location of an accident location: "2869 27 av." Additional information was also exchanged between Martin Cruz and Dixon assessing the potential value of the crashed vehicle.[12]

51.    An MPD accident report showed an accident occurred at SW 27 Avenue and SW 28 Street involving a red Toyota, Florida tag number XXX3RD. According to the MPD report, which was not written by PSA Dixon, the Toyota was removed by Wrecker Company #2 at the owner's request.

52.    Investigators subsequently interviewed the owner of the Toyota. The owner stated he responded to the accident scene after he learned the authorized driver of his car had

---

[12] **Martin Cruz:** "Injury's"; **Dixon:** "Veh hit a building fire rescue in route"; **Martin Cruz:** "K"; **Dixon:** "Its good"; **Martin Cruz:** "K be there now"; **Dixon:** "By burger king"; **Martin Cruz:** "U doing it? How u know is good"; **Dixon:** "Im here"; **Martin Cruz:** "K."

been transported by ambulance from the scene due to injuries caused by the accident. When the owner arrived, the tow truck operator was already at the scene. The tow truck operator recommended Garage #1 and told the owner to follow him there, which the owner did. The owner stated that neither he, nor the injured driver, contacted the tow truck operator for any service. The owner further stated his car was later totaled.

53. Repair file #3743 file from Garage #1 showed that a red Toyota, Florida tag number XXX3RD, was towed to Garage #1 on February 7, 2014. The repair file contained a tow bill from Wrecker Company #2 for a red Toyota, Florida tag number XXX3RD. The Wrecker Company #2 tow bill did not note the driver of the tow truck. The Garage #1 repair file contained a copy of a Bank of America check in the amount of $2,622.10 to pay for storage (26 days at $80 a day) yard fee ($100), administrative fee ($150), tow bill ($129) and taxes.

54. Several hours after the aforementioned text exchange, Dixon and Martin Cruz exchanged the following text messages regarding her payment:

> Dixon: "tell [Subject #1] I'm going to Jamaica if she don't have no bonus for me"
>
> Dixon: "What did [Subject #1] say????"
>
> Martin Cruz: "She's not here"

55. The above text message exchange is consistent with Dixon's admission that Martin Cruz and Garage #1 were paying her for the information regarding accident locations.

### Michael Perez and PSA Dixon Example

**February 4, 2014**

56. During the accident described above on February 4, 2014, the MPD report identified the other vehicle involved in the accident as a Toyota Matrix. The accident report indicated that this vehicle, like the Toyota Prius described above, had also been removed by Wrecker Company #1 at the "owner's request."

57. Garage #1 repair file #3720 showed a Wrecker Company #1 tow bill for the Toyota Matrix with the name "Michael" noted in the section for the driver's name. The Garage #1 repair file for the Toyota Matrix has the same identifying information such as the tag number reflected on the MPD accident report. The repair file also contained one check from Farmer's Insurance for $1,970.73.

58. The driver of the Toyota Matrix was subsequently interviewed by investigators. 2014. The driver stated that she was involved a traffic accident on February 4, 2014, on South Dixie Highway. The driver was unfamiliar with the procedures associated with her insurance company. The driver stated that the tow truck driver arrived at the accident scene before the

police responded and began the towing process upon arrival. The tow truck operator and his passenger told her they would take care of everything. The driver wanted to call her insurance company, but the tow truck driver told her that calling her insurance company would only delay the whole process. The driver stated she felt pressured by the tow truck operators and had no say as to what should happen to her car.

59.     The Toyota Matrix driver reported her vehicle was towed to a body shop working with the tow truck drivers and was not the auto body shop of her choice. The vehicle's driver later had issues with the body shop fixing her car in a timely manner and the quality of the work. The driver felt that the tow truck operators took advantage of her, and that she was helpless and powerless during the incident.

### Ronald Alfaro and PSA Paulino Example

**July 28, 2014**

60.     On July 28, 2014, a MPD accident report written by PSA Aristides Paulino documents an accident that occurred at S.W. 42nd Avenue and Loquat Avenue. One of the vehicles in the accident was listed as a black 2003 Honda Element, with Florida tag number XXXHPH. According to the accident report, the Honda was driven from the accident by the driver.

61.     The driver of the black Honda was subsequently interviewed by investigators. 2015. The driver confirmed that his vehicle was towed from the scene and was not driven from the scene, as indicated by PSA Paulino's report. The driver stated that she did not call for the tow truck driver who arrived on scene first and solicited business directly from her.

62.     Garage #1 repair order file #4320 reflects that the 2003 Honda Element was towed to Garage #1 by Wrecker Company #1 on July 28, 2014. The repair file contained a tow bill from Garage Company #1 for a black Honda Element, with a Florida tag number of XXX9UC, which is not the same tag number as the one listed in the report and repair order. However, the make and model (Honda Element) is consistent with the make and model on the accident report and repair order. The name "Ronald" was listed as the driver of the tow truck. The Garage #1 repair file contained two checks from Nationwide Insurance Company (Nationwide) for the vehicle's repair in the following amounts: $1,584.39, and $2,176.91.

### Interview of Garage #1 Employees

63.     Your affiant has interviewed two employees at Garage #1. Those employees have told your affiant and other investigators that Garage #1 would provide envelopes of cash to the tow truck operators and the tow truck companies that owned the tow trucks. At least one witness, recalls the owner of Wrecker Company #1 picking up envelopes of cash on multiple occasions directly from Garage #1's office. Your affiant has learned through interviews and

review of records, that while Wrecker Company #1 and Wrecker Company #2 can make money by performing rotational tows, it is much more lucrative for these companies to secretly circumvent their contractual obligations, classify tows as private tows (a/ka/ "owners request") rather than rotational, and then deliver those vehicles to Garage #1 in return for kickbacks.

### Review of City of Miami
### Rotational Tow Invoices and CAD reports.

64. In addition to the kickbacks, the incentive for the Wrecker Company #1 and Wrecker Company #2 to participate in the scheme is that they also avoid payment of the requisite tow fee to the City of Miami. For example, in regard to each of the records identified above, investigators have confirmed that none of the tows were the result of an officer or PSA requesting a rotational tow. In at least one instance, a rotational tow was initiated but then cancelled at "owner's request." As a result, the City of Miami has not been paid the approximate $25 administrative fee that would have been owed, as a result by Wrecker Company #1 and Wrecker Company #2, had the tows been conducted legitimately, in accordance with the rotational tow system, rotation contract, and State law.

### CONCLUSION

65. Based on the facts described above, your affiant respectfully submits there is probable cause to believe that, between in or around 2011, the exact date being unknown, and continuing through on or about December 2, 2014, Defendants Aristides Paulino, Keri Dixon, Jesus Tello, Reinaldo Martin Cruz, Michael Perez, Ronald Alfaro, and other known and unknown persons have knowingly and willfully conspired with each other to commit an offense against the United States, that is:

(a) to knowingly and with intent to defraud, devise, and intend to devise a scheme and artifice to defraud the City of Miami and its citizens of their intangible right to honest services by Miami Police Department (MPD) employees through bribes and kickbacks, and transmitting and causing to be transmitted certain wire communications in interstate commerce for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346; and

(b) to corruptly solicit and demand for the benefit of any person, accept and agree to accept anything of value from any person, intending to influenced and rewarded, as an agent of a State and local organization, government, and any agency thereof, in connection with any business, transaction, and series of transactions involving anything of value of $5,000 or more, within a one year period that said organization, government, and agency has received more than $10,000 under a Federal program, involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(1)(B);

(c) to corruptly give, offer, or agree to give anything of value to any person, with intent to

influence and reward an agent of an organization, State government, and local government, and any agency thereof, in connection with any business, transaction, and series of transactions of such or organization, government, and agency involving any of value of $5,000 or more.

FURTHER YOUR AFFIANT SAYETH NOT

*Donald P. Morin, II*
Donald P. Morin, II
Special Agent, FBI

Subscribed to and sworn before me on this
19 day of March, 2015, in Miami, Florida.

JOHN O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

16